**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

RANJIV SAINI, *et al.*,                              *

      Plaintiffs,                              *

v.                                                                  *          Civ. No. DLB-25-901

SUBURBAN HOSPITAL, INC., *et al.*,          *

      Defendants.                              *

<u>**MEMORANDUM OPINION**</u>

      Dr. Ranjiv Saini, individually and as personal representative of the estate of Dr. Nirmal Saini, and Sanjiv Saini (collectively, "the Sainis") brought this medical malpractice action after their 90-year-old mother was admitted to Suburban Hospital for treatment and died two weeks later. The Sainis sued Suburban Hospital, Inc., Suburban Hospital Healthcare System, Inc., Johns Hopkins Health System, and 18 healthcare providers, including Lieutenant Commander Dr. ("LCDR") Meredith Olsen, an active member of the United States Navy.

      The United States certified under the Westfall Act, 28 U.S.C. § 2679(d)(1), that LCDR Olsen was acting within the scope of her employment with the Navy at the time of the alleged medical malpractice and moved to substitute itself as a defendant for her. After that motion was granted, the United States moved to dismiss for lack of subject matter jurisdiction because the Sainis did not exhaust their pre-suit administrative remedies as required by the Federal Tort Claims Act ("FTCA") and the United States is thus immune from suit.

      For their part, the Sainis challenge the Westfall Act certification that LCDR Olsen was acting within the scope of her employment at the time of the alleged medical malpractice. As they see it, LCDR Olsen, not the United States, is the proper defendant for their claims against her, so they therefore did not need to exhaust administrative remedies under the FTCA and the

government's motion to dismiss for lack of subject matter jurisdiction should be denied. The Sainis also seek leave to amend their complaint to supplement their allegations against LCDR Olsen.

For the following reasons, the Sainis' motion to challenge certification under the Westfall Act is denied. The United States is the proper defendant for the Sainis' claims against LCDR Olsen. Because the Sainis did not exhaust their administrative remedies as required by the FTCA, the United States is immune from suit, and the motion to dismiss for lack of subject matter jurisdiction is granted. The Sainis' motion for leave to amend their complaint is denied because amendment would be futile. The claims against the remaining defendants are remanded to state court.

## I.     Background

### A.  Relevant Facts

The following allegations are taken from the Sainis' complaint.

On October 11, 2022, 90-year-old Dr. Nirmal Saini ("Dr. Saini") experienced "general weakness, a dry cough, and shortness of breath" and was admitted to Suburban Hospital in Bethesda, Maryland with "acute respiratory syncytial virus bronchiolitis infection ('RSV') with acute hypoxic respiratory failure." ECF 3, ¶¶ 9, 12. The Sainis allege that Dr. Saini's hospital physicians and staff negligently treated her, resulting in her wrongful death two weeks later. *See generally* ECF 3.

The Sainis assert several malpractice allegations specific to LCDR Olsen. These fall into six categories.

#### 1.  Improper screening upon admission

The Sainis claim that, when Dr. Saini was admitted, LCDR Olsen and other physicians failed to "conduct an extensive screening for concurrent bacterial infection . . . despite the presence

of a left shift in the WBC [white blood cell] differential." *Id.* ¶ 37. The Sainis allege that, if such screening had been done, "antibacterial treatment would have been promptly started, possibly preventing the exacerbation of acute respiratory decompensation" two days later. *Id.*

## 2. Failure to identify aspiration risk

The Sainis allege that LCDR Olsen and other physicians improperly overlooked Dr. Saini's "high likelihood of silent aspiration concerns given her frequent prone position due to acute illness for the week prior to admission." *Id.* ¶ 38. They claim that the doctors "overlooked significant findings from the CTA [CT angiogram] report" completed the day after Dr. Saini was admitted that were "suggestive for concerns of underlying silent aspiration pneumonitis given the extensive findings in the right lung." *Id.* ¶ 39. The Sainis maintain that "[t]his oversight resulted in Dr. Nirmal Saini's acute decompensation" the next day, as well as a "delay in diagnosis, delay in early speech therapy assessment, delay in initiation of preventive measures, such as aspiration precautions, and delay of appropriate treatment." *Id.* Relatedly, the Sainis claim that LCDR Olsen "failed to identify the need for early speech therapy assessment," which "would have identified the risk of aspiration and allowed initiation of preventive measures sooner." *Id.* ¶ 40.

## 3. Feeding tube misplacement

The Sainis also allege medical malpractice related to the insertion and monitoring of Dr. Saini's feeding tube.

A physician inserted a feeding tube on October 20, after Dr. Saini failed several swallow evaluations. *Id.* ¶ 22. Dr. Saini "persistently removed" it, and "providers consistently replaced it upon discovering that it had been removed." *Id.* Over the next few days, several chest x-rays were done to check placement of the feeding tube. *Id.* ¶¶ 26, 28, 30, 32. The Sainis allege that the x-rays

showed the feeding tubes were misplaced but that the physicians reviewing the scans failed to identify the misplacement. *Id.* ¶¶ 26, 28, 30, 32.

The Sainis allege that LCDR Olsen and another physician failed to conduct x-rays to monitor the placement of the feeding tube and failed to reposition it. *Id.* at 14–15, ¶¶ 42, 43. They also allege that LCDR Olsen and other healthcare providers failed to "use alternative measures to decrease the frequency of the removal" of Dr. Saini's feeding tubes. *Id.* ¶ 60.

### 4. Misuse and overuse of medications

The Sainis allege that LCDR Olsen and other physicians "utilized excessive polypharmacy at all levels of care" to treat Dr. Saini, contrary to American Geriatrics Society recommendations for medication use in elderly patients. *Id.* at 15, ¶ 44. The Sainis allege that this approach "significantly worsened" Dr. Saini's "metabolic encephalopathy and dysphagia, thereby hindering her clinical progress and triggering a chain of subsequent complications." *Id.* The Sainis claim that the risks and benefits of certain medications "were not appropriately discussed" with Dr. Ranjiv Saini, who had power of attorney for Dr. Saini. *Id.* One such medication was Seroquel, which LCDR Olsen prescribed on October 21 to treat Dr. Saini's "agitation at night." *Id.* ¶ 25. Dr. Ranjiv Saini allegedly "objected to this course of treatment," yet LCDR Olsen prescribed the medication until October 26. *Id.*

### 5. Failure to abide by advance directives

The Sainis claim that LCDR Olsen and other physicians failed to follow Dr. Saini's advance directives, which stated that she wanted resuscitation efforts to be made if necessary. *Id.* at 16, ¶ 45. The Sainis also allege that her healthcare agent Dr. Ranjiv Saini had specified that Dr. Saini should not be intubated but that all other resuscitation efforts should be made. *Id.* at 16, ¶ 46. The Sainis claim that, despite these instructions, nurse practitioners erroneously "placed an order

for DNR/DNI [Do Not Resuscitate/Do Not Intubate] status" and LCDR Olsen failed to confirm "[c]ode status." *Id.*

### 6. Mishandling of transfer to lower level of care

On October 21, Dr. Saini was transferred out of the ICU to a comfort care bed without Dr. Ranjiv Saini's knowledge. *Id.* at 17–18, ¶ 50. However, Dr. Saini's medical records "do not denote an appropriate transfer order for the lower level of care" by either LCDR Olsen or another physician. *Id.* The Sainis claim that the healthcare providers failed to continue necessary medications after Dr. Saini's transfer. *Id.* Similarly, the Sainis allege that Dr. Saini's medical records contain no "[d]ocumentation of routine nursing rounds and verification of [feeding] tube position." *Id.* They assert that this "lack of appropriate oversight more than likely resulted in the direct death" of Dr. Saini. *Id.*

Dr. Saini died on October 27, 2022. *Id.* ¶ 34.

### B. Procedural History

On November 19, 2024, the Sainis brought a medical malpractice action in the Circuit Court for Montgomery County, Maryland, against Suburban Hospital, Inc. ("the Hospital"), Suburban Hospital Healthcare System, Inc., Johns Hopkins Health System, Inc., and 18 healthcare providers, including LCDR Olsen. ECF 1-5, at 11; ECF 3, at 1–4. The Sainis allege that LCDR Olsen and other healthcare providers "negligently departed from the standard of care" when they treated Dr. Saini and, as a result, Dr. Saini "suffered serious respiratory failure, aspiration, and eventually death." ECF 3, ¶¶ 36, 43. As relief, the Sainis seek more than $75,000 in damages. *Id.* at 40.

On March 9, 2025, the Chief of the Civil Division of the United States Attorney's Office for the District of Maryland certified under the Westfall Act, 28 U.S.C. § 2679(d)(1), that LCDR

Olsen was acting within the scope of her employment at the time of the allegations in the complaint. *See* ECF 1-3. On March 19, 2025, the United States removed this case to federal court. ECF 1. Two days later, the United States, on behalf of LCDR Olsen, moved to substitute itself as the defendant for the Sainis' medical malpractice claims against LCDR Olsen. ECF 5. The Court granted the motion without prejudice to the Sainis' ability to challenge the Westfall Act certification, and the United States was substituted as a defendant in place of LCDR Olsen. ECF 22.

There are five pending motions. First, the United States moved to dismiss for lack of subject matter jurisdiction. ECF 13. That motion is fully briefed. ECF 13-1, 17, 21. Second, the Sainis moved to set aside Westfall Act certification that LCDR Olsen was acting within the scope of her employment. ECF 28. That motion is fully briefed. ECF 28-1, 38, 39. Third, the Sainis filed a motion for leave to file an amended complaint. ECF 52. That motion also is fully briefed. ECF 52-1, 60, 61. Fourth, the Sainis filed a motion for leave to file a supplemental reply in support of their motion for leave to file an amended complaint. ECF 62. Finally, the Sainis filed a motion to schedule a case management conference under Rule 16(b). ECF 63. No hearing on the pending motions is necessary. *See* Loc. R. 105.6 (D. Md. 2025).

## II.    Motion to Set Aside Westfall Act Certification

"The Westfall Act immunizes federal employees from personal liability for claims that arise within the scope of their employment." *Doe v. Meron*, 929 F.3d 153, 160 (4th Cir. 2019). Under the Act, when a federal employee is sued,

> [u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1).

Here, the Chief of the Civil Division of the U.S. Attorney's Office for the District of Maryland certified that he read the Sainis' complaint and that LCDR Olsen "was acting within the scope of her employment as an employee of the United States of America at the time of the alleged incidents." ECF 1-3. "Once this certification has been made, the United States is substituted as the sole defendant" and "the plaintiff's sole route for recovery is the [Federal] Tort Claims Act." *Maron v. United States*, 126 F.3d 317, 321 (4th Cir. 1997). "[E]ven in cases where the United States has not waived its immunity, the United States must still be substituted and the individual defendant still remains immune from suit if the tort occurred within the scope of employment. The plaintiff, despite the seeming unfairness, cannot proceed against the individual defendants." *Id.* at 321–22. Consistent with this law, the Court granted the motion to substitute the United States as the defendant for the claims against LCDR Olsen.

The Sainis move to set aside the Westfall Act certification. Indeed, certification that an employee was acting within the scope of their employment "is reviewable in court." *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995). Westfall Act certification "satisfies the government's prima facie burden but does not carry any evidentiary weight unless it details and explains the bases for its conclusions." *Maron*, 126 F.3d at 323. In response to the certification, a plaintiff may "present[ ] persuasive evidence refuting the certification." *Id.* A plaintiff, "at minimum, [must] present or forecast evidence that shows that the conduct of the officers and employees at issue did not involve the type of work they were employed to perform, occurred outside authorized space and time or was purely personal in nature." *Meron*, 929 F.3d at 165. To show that the defendant was acting outside the scope of her employment, the plaintiff "must be able to show that [the defendant] [was] solely motivated by a personal desire." *Id.* at 166. A

plaintiff may rely on pleadings as well as supporting documentary evidence, including affidavits. *Id.* at 165. They "cannot rely on conclusory allegations and speculation." *Id.* The plaintiff "must prove by a preponderance of the evidence that the defendant was acting outside the scope of his employment." *Id.*; *see also Maron*, 126 F.3d at 323.

If the plaintiff "presents persuasive evidence refuting the certification," the burden shifts to the government to "provide evidence and analysis to support its conclusion that the torts occurred within the scope of employment." *Maron*, 126 F.3d at 323.

"At all stages of the process, it is for the district court to weigh the sufficiency of the evidence, to determine whether genuine issues of fact exist, and ultimately to resolve these factual issues." *Borneman v. United States*, 213 F.3d 819, 827 (4th Cir. 2000). "Once any factual issues are resolved, the district court must then proceed to 'weigh the evidence on each side to determine whether the certification should stand.'" *Id.* (quoting *Gutierrez de Martinez v. Drug Enf't Admin.*, 111 F.3d 1148, 1155 (4th Cir. 1997)).

### A.  Scope of Employment

"[T]he question of whether [a person] was acting within the scope of [their] employment when [they] committed the alleged tortious acts" is "governed by the law of the state in which the alleged tort occurred." *U.S. Tobacco Coop. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 249 (4th Cir. 2018). The alleged tort here occurred in Maryland, and both parties agree that Maryland law governs the scope of employment inquiry. *See* ECF 28-1, at 7; ECF 38, at 6.

In Maryland, the "test . . . for determining if an employee's tortious acts were within the scope of his employment is whether they were in furtherance of the employer's business and were 'authorized' by the employer." *Sawyer v. Humphries*, 587 A.2d 467, 470 (Md. 1991) ("*Sawyer* test"). Under the *Sawyer* test, Maryland courts apply principles of agency law. *Id.* at 471. Some of

the "pertinent" considerations include whether "the conduct [is] of the kind the servant is employed to perform," if it "occur[s] during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area," and if it was "actuated at least in part by a purpose to serve the master." *Id.* (quoting *E. Coast Freight Lines v. Mayor & City Council of Baltimore*, 58 A.2d 290, 304 (Md. 1948) (citing Restatement of Agency, § 228 cmt. b)). The Maryland Supreme Court has cautioned that "[i]n applying this test, there are few, if any, absolutes." *Id.*

The first prong of the *Sawyer* test asks whether the employee's acts were in furtherance of the employer's business. To answer that question, courts assess whether the employee's conduct was "at least partially motivated by a purpose to serve [the employer]" or whether the employee "[was] 'acting to protect [their] own interests.'" *See Balt. City Police Dep't v. Potts*, 227 A.3d 186, 211 (Md. 2020) (quoting *Sawyer*, 587 A.2d at 470–71). Particularly in the case of intentional torts, an act is outside the scope of employment where "an employee's actions are personal, or where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his own interests, even if during normal duty hours and at an authorized locality[.]" *Sawyer*, 587 A.2d at 471. "'[W]here the conduct of the servant is unprovoked, highly unusual, and quite outrageous,' courts tend to hold 'that this in itself is sufficient to indicate that the motive was a purely personal one' and the conduct outside the scope of employment." *Id.* (quoting *Prosser and Keeton on The Law of Torts* § 70, at 506 (5th ed. 1984)). Not all intentional torts are outside the scope of employment, however: "[A]n employer 'may be held liable for the intentional torts of [an employee] where the [employee]'s actions are within the scope and in furtherance of the [employer]'s business and the harm complained of was

foreseeable.'" *Potts*, 227 A.3d at 199 (second, third, and fourth alterations in original) (quoting *Cox v. Prince George's Cnty.*, 460 A.2d 1038, 1043 (Md. 1983)).

The second prong of the *Sawyer* test asks whether the employee's acts were authorized by the employer. Even conduct that is "not intended or consciously authorized by the master" may be within the scope of employment if it is "'of the same general nature as that authorized, or incidental to the conduct authorized.'" *Sawyer*, 587 A.2d at 471 (quoting *Greater Atl. & Pac. Co. v. Noppenberger*, 189 A. 434, 440 (Md. 1937)). To determine whether the conduct is "so similar to or incidental to the conduct authorized as to be within the scope of employment," the Maryland Supreme Court has cited with approval the following factors from the Restatement of Agency:

> (a) [W]hether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and the servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of departure from the normal method of accomplishing an authorized result, and (j) whether or not the act is seriously criminal.

*Noppenberger*, 189 A. at 440 (quoting Restatement of Agency § 229); *see also Sawyer*, 587 A.2d at 471. Courts also consider "whether the employee's conduct was 'expectable' or 'foreseeable.'" *Sawyer*, 587 A.2d at 256 (quoting *Cox*, 460 A.2d at 1042).

In *Baltimore City Police Department v. Potts*, 227 A.3d 186, the Maryland Supreme Court recently applied the *Sawyer* test to determine whether the criminal conduct of on-duty police officers was within the scope of their employment with the Baltimore City Police Department. The *Potts* Court held that police officers who made stops and arrests without reasonable suspicion or probable cause, fabricated evidence, beat arrestees, made false statements in police reports, and lied under oath when they testified against defendants in criminal trials acted within the scope of

their employment—even though the police department "expressly forbade" the police officers'
misconduct. 227 A.3d at 192. Applying the *Sawyer* test, the *Potts* Court determined that "the
officers' actions were 'incident[al] to the performance of the duties' that the Department entrusted
to them, and those actions did not render the officers' overall conduct outside the scope of
employment." *See id.* (alteration in original) (quoting *Sawyer*, 587 A.2d at 470); *id.* at 214–15. The
*Potts* Court found that the officers "were engaging in a police activity" when the misconduct
occurred, that they "were at least partially motivated by a purpose to serve the Department," and
that "there [wa]s no indication that the officers were 'acting to protect [their] own interests[.]'" *Id.*
at 211 (second and third alterations in original) (quoting *Sawyer*, 587 A.2d at 470–71).
Notwithstanding the "wrongfulness" of the officers' actions, they were within the scope of the
officers' employment:

> The issue that is before us, though, is not whether the officers' conduct was
> wrongful; it clearly was. Instead, the issue is whether the City and the Department
> are responsible for the officers' actions because their actions were within the scope
> of employment. We determine that the officers' actions were within the scope of
> employment[.]

*Id.* at 210.

Contrast the facts in *Potts* with the facts in *Sawyer*, where the Maryland Supreme Court
found a police officer had *not* acted within the scope of his employment. In *Sawyer*, an off-duty
police officer allegedly attacked someone and threw rocks at his car. 587 A.2d at 468. This conduct
"had nothing to do with the defendant's duties as a police officer." *Id.* at 472. The police officer
was not on duty at the time, and he was driving his personal car. *Id.* Moreover,

> there [wa]s no suggestion in the complaint that [the off-duty officer] was attempting
> to question, stop, detain or arrest the plaintiffs in connection with any traffic or
> criminal offense or any other matter of concern to the police department.... [I]nsofar
> as it appears from the complaint, [the officer] was acting for purely personal reasons
> and not incidental to any State law enforcement purpose.

*Id.* at 472 (footnote omitted). The *Sawyer* Court thus concluded that the police officer was not acting within the scope of his employment.

### B.  Whether LCDR Olsen was Acting Within the Scope of Her Employment

With these cases in mind, the Court considers whether the Sainis have met their burden to "present or forecast evidence that shows that" LCDR Olsen was acting outside the scope of her employment. *See Meron*, 929 F.3d at 165. They have not.

Start with the first *Sawyer* prong—whether the allegedly improper medical treatment was provided in furtherance of LCDR Olsen's employer's business. Under this prong, conduct is in furtherance of the employer's business when it was "at least partially motivated by 'a purpose to serve' [the employer]." *Potts*, 227 A.3d at 211 (quoting *Sawyer*, 587 A.2d at 471). Here, it was.

At the time of the alleged malpractice, LCDR Olsen had completed medical school and residency and was receiving fellowship training at the Hospital under an agreement between the National Capital Consortium ("NCC") and the Hospital. ECF 38, at 2; ECF 38-2, at 1. The NCC is an institution of the U.S. government, *see* ECF 38-2, at 1, and it "functions as the sponsoring institution for military graduate medical education programs in the National Capital Area," Nat'l Capital Consortium, https://health.mil/Education-and-Training/DHA-GME/Institutions/NCC (last visited Feb. 20, 2026) [https://perma.cc/BW7S-U4JV]. The organization "provides a robust scholarly environment and a dedication to excellence in both education and health care that will enhance the field of military medicine." *Id.* The NCC and the Hospital were parties to an agreement through which trainees, who "must be physicians serving on active duty in the United States military," serve as fellows at the Hospital. ECF 38-2, at 1. The agreement's purpose was to "benefit both parties, by contributing to the educational preparation of a future supply of health care personnel." *Id.* Trainees were to "perform clinical care and training under the control and

supervision of [Hospital] officials for training purposes." *Id.* The agreement also specifies that, "while assigned to [the Hospital] and training pursuant to the terms of this agreement, the [NCC] trainees remain employees of the United States performing duties within the course and scope of their federal employment." *Id.* at 4.

Pursuant to the agreement between the NCC and the Hospital, LCDR Olsen, a physician on active duty in the U.S. Navy, was a training fellow authorized to treat patients at the Hospital. The clinical training that LCDR Olsen was to receive advanced the NCC's goal of developing "a future supply of health care personnel." *See* ECF 38-2, at 1. The entirety of the Sainis' allegations against LCDR Olsen concern her provision of clinical care to Dr. Saini at the Hospital—exactly what the training agreement between the NCC and the Hospital authorized and expected LCDR Olsen to do. In fact, the training agreement anticipates the possibility of a medical malpractice lawsuit against NCC employees and requires the Hospital to notify the NCC if one of its trainees is sued. ECF 38-2, at 3. Beyond their allegations, the Sainis have not "present[ed] or forecast[ed]" any evidence that would show that LCDR Olsen did anything other than provide clinical care to Dr. Saini. *See Meron*, 929 F.3d at 165.[1] Thus, this Court concludes that LCDR Olsen's actions were in furtherance of her employer's business of providing clinical care in a hospital setting "because they were . . . motivated by a purpose to serve" the NCC "and because there is no indication that [LCDR Olsen] [was] 'acting to protect [her] own interests.'" *See id.* (quoting *Sawyer*, 587 A.2d at 470–71).

---

[1] The Sainis submitted affidavits from four physicians who claim LCDR Olsen was not supervised properly by an attending physician, *see* ECF 28-2 (Dr. Lester decl.), ¶ 7; ECF 28-3 (Dr. Hofmann decl.), ¶ 15; ECF 28-4 (Dr. Ranjiv Saini decl.), ¶ 19; ECF 28-5 (Dr. Shaw decl.), ¶ 13, but even they do not contend that LCDR Olsen did anything other than provide clinical care to Dr. Saini.

Next, consider the second *Sawyer* prong—whether LCDR Olsen's actions were "authorized" by the NCC. *See Potts*, 227 A.3d at 214. To make this determination, the Court considers the Restatement of Agency factors, as the *Potts* Court did. *See Noppenberger*, 189 A. at 440 (quoting Restatement of Agency § 229).

In *Potts*, the Maryland Supreme Court considered the ten factors from the Restatement of Agency to determine whether the police officer's actions "w[ere] incidental to actions authorized by the Department." *Id.* at 214. Notably, in going through the factors, the *Potts* Court did not focus much on the wrongful nature of the conduct, such as the lack of probable cause for the officers' arrests or their fabrication of evidence. Instead, the court primarily looked at the tasks the police officers performed when they undertook these actions. For example, although the officers were making unlawful arrests, the court noted that "[t]he officers' actions appear to consist of police activities during which the officers engaged in misconduct for the purpose of giving the appearance of making lawful arrests on behalf of the Department," their conduct "occurred while they were on-duty officers of the Department," "the purpose of the officers' misconduct appeared to be to further the Department's routine business of making arrests," and "[m]ost of the officers' misconduct consisted of taking authorized actions in unauthorized ways." *Id.* at 215–17. Ultimately, the factors "weigh[ed] in favor of determining that the officers' misconduct is to be considered authorized," particularly because "there was no indication that they were acting for their own personal benefit." *Id.* at 218.

The *Potts* Court's analysis of the Restatement of Agency factors guides this Court's analysis. As in *Potts*, "an assessment of the factors concerning 'whether or not the act[ions are] commonly done by such [employee]s' and 'the time, place[,] and purpose of the act[ions]' weighs in favor of a determination that" LCDR Olsen's actions were authorized by the NCC. *See Potts*,

227 A.3d at 214 (quoting *Sawyer*, 587 A.2d at 471) (alterations in *Potts*). The record shows that

LCDR Olsen's alleged conduct—treating Dr. Saini, a patient at the Hospital—was what she was

hired to do and that it occurred while she was working at the Hospital as a critical care fellow. *See*

*generally* ECF 3 (describing LCDR Olsen's alleged medical malpractice in treating Dr. Saini); *see*

*also* ECF 38-1 (duty order); ECF 38-2 (training agreement). LCDR Olsen's clinical care of Dr.

Saini furthered the NCC's business of training military physicians. Thus, "the factors concerning

whether the actions are commonly done by the [employees] and the time, place, and purpose of

the actions tilt in favor of establishing that" LCDR Olsen's actions were authorized. *See Potts*, 227

A.3d at 215.

    As in *Potts*, the allegations and record contain no information about "the previous relations

between the [employer] and the [employee]." *See id.* (quoting *Sawyer*, 587 A.2d at 471)

(alterations in *Potts*). Thus, "[t]his factor is of no consequence in the analysis." *See id.*

    Next, the Court considers "whether the act[ions are] outside the enterprise of the

[employer] or, if within the enterprise, ha[ve] not been entrusted to any [employee]." *Potts*, 227

A.3d at 216 (quoting *Sawyer*, 587 A.2d at 471) (alterations in *Potts*). The relevant question here is

whether LCDR Olsen's actions "were ones that the [employees] are plainly entrusted to perform."

*See id.* They were. The NCC is in the business of facilitating medical training for physicians who

are active members of the U.S. military. LCDR Olsen, an active member of the Navy, was "plainly

entrusted" by her employer to treat patients during her critical care fellowship at the Hospital. *See*

*id.* This factor weighs in favor of finding LCDR Olsen's actions were authorized.

    Another factor—"whether or not the [employer] has reason to expect that such [ ] act[ions]

will be done"—likewise weighs in favor of finding LCDR Olsen's actions were authorized. *See*

*Potts*, 227 A.3d at 216 (quoting *Sawyer*, 587 A.2d at 471) (alterations in *Potts*). The NCC expected

that LCDR Olsen would treat Dr. Saini, a patient of the Hospital where LCDR Olsen was assigned to provide clinical care to patients. The NCC even had reason to expect that LCDR Olsen's treatment of patients at the Hospital might result in a medical malpractice claim against her. *See* ECF 38-2, at 4.

The Sainis see it differently. They argue that LCDR Olsen "exceeded the scope of practice allowable" under her training fellowship because she was not properly supervised by an attending physician when she treated Dr. Saini. ECF 28-1, at 7. To support this argument, the Sainis submitted affidavits of four physicians, one of whom is Dr. Saini's son and a plaintiff, Dr. Ranjiv Saini. Each of the affiants opines that LCDR Olsen was unsupervised and essentially was acting as an attending physician, which they claim was outside the scope of her employment as a clinical care fellow. *See* ECF 28-2 (Dr. Lester decl.), ¶ 7 (LCDR Olsen "wrote prescriptions and placed orders" without supervision, which "took her outside the scope of her fellowship training program and essentially made her a de facto attending physician"); ECF 28-3 (Dr. Hofmann decl.), ¶ 15 (LCDR Olsen was "permitted to assume a lead role as an attending physician"); ECF 28-4 (Dr. Ranjiv Saini decl.), ¶ 19 (LCDR Olsen was "conducting rounds . . . on her own and without the supervision of an attending physician"); ECF 28-5 (Dr. Shaw decl.), ¶ 13 (LCDR Olsen "should have been attached to an attending physician and should not have been given the ability to lead a treatment plan or write prescriptions"). Whatever merit there may be to the argument that LCDR Olsen was not supervised properly, these affidavits do not show that LCDR Olsen's employer, the NCC, did not have a reason to expect that LCDR Olsen would never treat patients without the direct supervision of an attending physician. True, the training agreement states that "trainees will perform clinical care and training under the control and supervision of [Hospital] officials for training purposes." ECF 38-2, at 1. But it does not state that every discrete act performed by the

trainee—like prescribing medication or leading a treatment plan—must be supervised or authorized by an attending physician. Moreover, the agreement states that trainees are supervised "for training purposes," *id.*, suggesting supervision is for the benefit of the fellows' education and training. As in *Potts*, then, "[r]egardless of whether the [NCC] had actual notice or actual knowledge" that LCDR Olsen was treating patients without the direct supervision of an attending physician, "[her] actions were expectable or foreseeable from the [NCC's] [ ] perspective." *See Potts*, 227 A.3d at 216. Thus, even if LCDR Olsen was not properly supervised by an attending physician when she treated Dr. Saini, she was not acting outside the scope of her employment with the NCC.

Another factor, the "similarity in quality of the act[ions that were] done to the act[ions that were] authorized [by the employer]," also cuts in favor of finding that LCDR Olsen's actions were authorized. *See Potts*, 227 A.3d at 217 (quoting *Sawyer*, 587 A.2d at 471) (alterations in *Potts*). The Sainis do not argue that LCDR Olsen was not permitted to make treatment plans or prescribe medication *at all*. Rather, they argue that LCDR Olsen was not permitted to do these things without supervision, and for that reason, they claim her actions were not authorized by her employer. The *Potts* Court rejected a similar argument. If, as in *Potts*, LCDR Olsen's alleged misconduct "consisted of taking authorized actions in" allegedly "unauthorized ways," the unauthorized actions were "inextricably intertwined with authorized actions." *See Potts*, 227 A.2d at 217. And here they were. If, as the Sainis insist, LCDR Olsen was unauthorized to prescribe medication or develop a treatment plan for Dr. Saini without first obtaining the approval of an attending physician, those unauthorized actions were inextricably intertwined with authorized actions, which included providing clinical care to patients. As in *Potts*, this "militates in favor of determining

that" LCDR Olsen's alleged misconduct "was incidental to the performance of duties entrusted to [her] by the [NCC]." *See id.*

"[W]hether or not the instrumentality by which the harm is done has been furnished by the [employer]" also weighs in favor of finding that LCDR Olsen's actions were authorized. *See Potts*, 227 A.3d at 217 (quoting *Sawyer*, 587 A.2d at 471) (alteration in *Potts*). In the training agreement, the Hospital agreed to provide the NCC's trainees with "the clinical and related facilities needed for training." *See* ECF 38-2, at 2. At all relevant times, LCDR Olsen used the Hospital's facilities for training and to treat Dr. Saini.

Finally, the Court considers "the extent of departure from the normal method of accomplishing an authorized result" and "whether or not the act[ions are] seriously criminal." *See Potts*, 227 A.3d at 217 (quoting *Sawyer*, 587 A.2d at 471) (alteration in *Potts*). As to these factors, the Sainis argue that LCDR Olsen's actions were departures from the normal method of treating patients because, they say, a fellow like LCDR Olsen ordinarily would not act without the supervision of an attending physician. But the Sainis have not "present[ed] or forecast[ed] evidence that shows that" LCDR Olsen's conduct was in fact such a departure. *See Meron*, 929 F.3d at 165. Dr. Lester claims that he is "familiar with fellowship training programs that permit physicians in the armed forces to conduct rotations at civilian hospitals," ECF 28-2, ¶ 6, but he does not explain how LCDR Olsen's conduct was a departure from the normal method of accomplishing clinical training of military physicians in civilian hospitals. Moreover, even if LCDR Olsen's clinical treatment of Dr. Saini without the direct supervision of an attending physician was a departure from the "normal method of accomplishing an authorized result," *see Potts*, 227 A.3d at 217, the departure was modest.

As for whether LCDR Olsen's actions were criminal, the Sainis make no such claim. The closest they come to alleging misconduct is their affiants' assertions that LCDR Olsen was not licensed to practice medicine in Maryland. ECF 28-2, ¶ 3; ECF 28-3, ¶ 15; ECF 28-4, ¶ 24; ECF 28-5, ¶ 10. Yet they do not claim that LCDR Olsen was not licensed to practice medicine *at all* or that practicing medicine in Maryland without a Maryland license is a crime. Rather, the affiants opine that the Hospital breached the standard of care by allowing LCDR Olsen to act as an attending physician when she was not a licensed Maryland physician. *See* ECF 28-3, ¶ 16 ("Allowing a fellow to act as an attending physician without being credentialed is a breach of the standard of care."); ECF 28-5, ¶ 10 ("The hospital breached the standard of care in permitting Dr. Olsen, who was not licensed to practice medicine in Maryland, and therefore could not have been credentialed, to write prescriptions."). These opinions that the *Hospital* breached the standard of care are irrelevant to the scope of employment inquiry. That inquiry focuses on LCDR Olsen's actions in relation to her employer, the NCC, not the Hospital's actions in relation to her.

For the foregoing reasons, the Sainis have failed to meet their burden to present or forecast evidence showing that LCDR Olsen's conduct was not "in furtherance of [her] employer's business" or not "authorized by [her] employer." *See Sawyer*, 587 A.2d at 470.[2] They have not

---

[2] The Sainis' request for "limited discovery" pursuant to Rule 56(d) on "the nature of the fellowship, the governing documents, the agreed upon scope, the payment and billing records for Dr. Olsen, and any chart or staff notes reflecting the purpose of the fellowship," ECF 28-1, at 1, 8, is denied. The Sainis claim they need additional evidence to address "whether Dr. Olsen was properly supervised; whether she was credentialed or privileged at Suburban Hospital; whether her conduct was consistent with the scope of her fellowship; whether she was in fact displacing Suburban Hospital physicians; and whether the coding of her treatment on invoices submitted to Medicare or other hospital billing records reflect her role as outside the scope of a trainee." ECF 39, at 4. But the Sainis have not shown how this evidence would tend to establish that LCDR Olsen's conduct "did not involve the type of work [she] [was] employed to perform, occurred outside authorized space and time or was purely personal in nature." *See Meron*, 929 F.3d at 165.

refuted the Westfall Act certification. The motion to decertify the Westfall Act certification is denied. The United States remains the proper defendant.

### III.    Motion to Dismiss for Lack of Subject Matter Jurisdiction

The United States moves to dismiss the Sainis' claims against it for lack of subject matter jurisdiction. "A motion to dismiss based on lack of subject matter jurisdiction pursuant to Rule 12(b)(1) raises the question of whether the Court has the competence or authority to hear the case." *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). "Federal courts are courts of limited jurisdiction[,]" possessing "only that power authorized by Constitution and statute." *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010) (quoting *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994)). The plaintiff, as the party asserting jurisdiction, bears the burden of establishing it. *Id.* When, as here, the defendant contests subject matter jurisdiction "by contending that, even assuming that the allegations are true, the complaint fails to set forth facts upon which jurisdiction is proper"—a facial challenge to jurisdiction—the plaintiff "is afforded the same procedural protections as he would receive under a Rule 12(b)(6) consideration[.]" *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)) (internal quotation marks omitted). Dismissal for lack of subject matter jurisdiction is proper "where a claim fails to allege facts upon which the court may base jurisdiction." *Davis*, 367 F. Supp. 2d at 799 (citing *Crosten v. Kamauf*, 932 F. Supp. 676, 679 (D. Md. 1996)).

The United States argues this Court does not have subject matter jurisdiction over the tort claims against it because the Sainis did not exhaust administrative remedies under the FTCA and the United States is thus entitled to sovereign immunity. "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475

(1994). The FTCA provides a limited waiver of sovereign immunity for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of [their] office or employment." 28 U.S.C. § 1346(b)(1). However, before a plaintiff may bring a tort claim against the United States, they first must exhaust administrative remedies. *See* 28 U.S.C. § 2675. This requirement is jurisdictional. *See Est. of Van Emburgh by & through Van Emburgh v. United States*, 95 F.4th 795, 800–01 (4th Cir. 2024) (describing FTCA administrative exhaustion requirement as a "jurisdictional prerequisite" that a plaintiff "must satisfy" before suing under the FTCA). To exhaust administrative remedies, a plaintiff must do three things: (1) "present[ ] [their] claim to the appropriate Federal agency"; (2) identify the "sum" they seek for their claim; and (3) wait for the agency's final denial of their claim or for the agency's failure "to make final disposition of [the] claim within six months after it is filed." 28 U.S.C. § 2675(a), (b).

Here, the Sainis do not allege they submitted an administrative tort claim to the Navy, and the undisputed record establishes they did not. *See* ECF 13-2 (declaration of Stephanie Corbin, Head of Navy Tort Claims Branch), at 2. The deadline for submitting an administrative claim expired on October 27, 2024, two years after Dr. Saini's death. *See* 28 U.S.C. § 2401 ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues[.]"). No amendment can cure this jurisdictional defect.

In response, the Sainis do not claim they exhausted administrative remedies. Instead, they hang their hat on the now-rejected argument that the FTCA and its exhaustion requirements do not apply because LCDR Olsen was not acting within the scope of her employment at the time of the alleged medical malpractice. *See* ECF 17, ¶ 6. Having rejected this argument for the reasons stated

above, the Court finds that it lacks subject matter jurisdiction over the Sainis' claims against the United States because the Sainis did not exhaust administrative remedies as required by the FTCA. The United States enjoys sovereign immunity.

The United States' motion to dismiss for lack of subject matter jurisdiction is granted.

## IV.    Motion for Leave to Amend

The Sainis move for leave to amend their complaint to "amplify the claims against Dr. Meredith Olsen." ECF 52-1, at 3. The amplification is essentially an effort to defeat Westfall Act certification by adding allegations not alleged in their original complaint. In their proposed amended complaint, the Sainis allege that, when LCDR Olsen treated Dr. Saini, she "was not acting in the course and scope of her service and fellowship from the United States Navy but was instead acting as a de facto civilian critical care medicine physician." ECF 52-1, at 3. The Sainis allege that LCDR Olsen was "fresh in her training" and that she was "a critical care fellow participating as part of the training program contractually agreed to between Walter Reed and Suburban." *Id.* ¶¶ 55, 58. They also allege that, under the training agreement, LCDR Olsen "was supposed to be closely supervised by an experienced attending in critical care medicine; but, she was not." *Id.* ¶ 57; *see also id.* ¶ 61 (the agreement "required [LCDR Olsen] to be consistently supervised for training purposes"), ¶ 84 (LCDR Olsen was never "accompanied or supervised by credentialed attending physicians"). They further allege that, "without any training or guidance," LCDR Olsen "was permitted to conduct rounds at Suburban Hospital and began to be in charge of the treatment of Dr. Nirmal Saini." *Id.* ¶ 58. They assert that LCDR Olsen thus "acted outside the scope of the Training Agreement" because she acted as "a lead physician rounding independently and making orders for medication and other treatment." *Id.* ¶ 61. And they allege that LCDR Olsen's orders were "only reviewed, if at all, several hours after the fact, after the orders had

already been carried out." *Id.* The Sainis further allege that LCDR Olsen was "not performing services for the United States" and "did not identify herself as a U.S. Naval physician" when she treated Dr. Saini, and instead "gave all appearances of being on staff at the hospital." *Id.* ¶¶ 59, 60; *see also id.* ¶ 84 (LCDR Olsen "presented herself as appearing to be a staff physician at Suburban Hospital"). They also claim that LCDR Olsen's entries in Dr. Saini's chart included "no designation . . . to distinguish her role from that of a fully licensed attending physician." *Id.* ¶ 85. And, finally, the Sainis seek to add more details about LCDR Olsen's alleged medical malpractice. *See, e.g.*, *id.* ¶ 63 (misuse and overuse of medication), ¶¶ 62–65, 95 (disregard of aspiration risk).

A party may amend its pleading once as a matter of course and then "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(1), (2). "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "A motion to amend should only be denied when 'the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.'" *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 217–18 (4th Cir. 2019) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999)).

The government argues amendment would be futile. Amendment is futile "if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011). In the United States' view, the Sainis still fail to adequately allege in the proposed amended complaint that LCDR Olsen was acting outside the scope of her employment. Thus, the government argues, even if amendment were allowed, the Westfall Act certification would stand, and the Court still would not have subject matter jurisdiction over the claims against the United States because the Sainis did not exhaust their remedies under the FTCA. The Court agrees with the government.

None of the Sainis' proposed new allegations about LCDR Olsen change the Court's conclusion that the Sainis have not alleged that LCDR Olsen was acting outside the scope of her employment. The proposed allegations that LCDR Olsen improperly acted without supervision and thus acted outside the scope of employment, *see, e.g.,* ECF 52-1, ¶¶ 58, 61, do not defeat Westfall Act certification. As the Court explained above, even if LCDR Olsen treated Dr. Saini without the supervision of an attending physician, that does not mean she was acting outside the scope of her employment. Likewise, the proposed allegations that LCDR Olsen was "fresh in her training," ECF 52-1, ¶ 55, and that LCDR Olsen "did not identify herself as a U.S. Naval physician" when she treated Dr. Saini, and instead "gave all appearances of being on staff at the hospital," *id.* ¶ 60, would not defeat Westfall Act certification. The Sainis do not explain how LCDR Olsen's limited training experience or her failure to properly identify herself to Dr. Saini or her family bears on the scope of employment question. And the Court finds they do not. Thus, even with the proposed amendments, the Sainis could not defeat the Westfall Act certification, and for the reasons stated above, the claims against the United States would be dismissed for lack of subject matter jurisdiction.

The Sainis' motion for leave to amend is denied.[3]

---

[3] The Sainis' proposed amended complaint includes new allegations about defendants other than LCDR Olsen. Because the Court's ruling on the motion for leave to amend is limited to the proposed amendments as they relate to LCDR Olsen, the Court does not rule on the other proposed allegations. For the same reasons, the Court also does not rule on the Sainis' motion for leave to file a supplemental reply memorandum in support of their motion for leave to file an amended complaint, ECF 62, in which they seek to respond to an argument raised by the Suburban Hospital defendants. The motion for leave to file a supplemental reply is denied as moot, without prejudice to renewal in state court.

V.    **Remaining State Law Claims**

The Sainis' claims against the Hospital, Suburban Hospital Healthcare System, Johns Hopkins Health System, and 17 healthcare providers remain. The Court declines to exercise supplemental jurisdiction over these claims.

Federal district courts have jurisdiction to hear only "civil actions arising under the Constitution, laws, or treaties of the United States" and "civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States . . . ." 28 U.S.C. §§ 1331, 1332(a)(1). This Court has diversity jurisdiction, with certain class action exceptions not relevant here, when there is "complete diversity among the parties, meaning that the citizenship of every plaintiff must be different from the citizenship of every defendant." *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011). The plaintiffs and the remaining defendants are all Maryland residents, *see* ECF 3, at 1–4 (listing Maryland addresses for plaintiffs and defendants), and for purposes of diversity jurisdiction, they are citizens of Maryland. Because there is not complete diversity among the parties, the Court does not have diversity jurisdiction over the remaining claims. Nor does the Court have federal question jurisdiction over the state torts arising under Maryland law. Thus, this Court lacks original jurisdiction over the state negligence claims.

That said, the Court may exercise supplemental jurisdiction over the state negligence claims. Here, the United States removed this case under 28 U.S.C. § 1442, which allows a federal defendant to remove a "civil action . . . commenced in a State court . . . against" them. 28 U.S.C. § 1442(a)(1). Because the United States then raised a federal defense (sovereign immunity), the Court "acquire[d] federal question jurisdiction over the claim against" the United States. *Lewis v. United States*, No. DKC 22-2566, 2023 WL 3304890, at *4 (D. Md. May 8, 2023). And, in turn,

§ 1442(a) permitted the Court to "exercise 'a species of statutorily-mandated supplemental subject-matter jurisdiction'" over the state-law claims against the non-federal defendants. *Id.* (quoting 14C Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 3726 (4th ed. Apr. 2023 update)). Once the Court's jurisdiction has been so established, "[f]rom that point forward, 'later developments in the suit' do not 'defeat[ ]'" it. *Id.* (quoting *Jamison v. Wiley*, 14 F.3d 222, 238–39 (4th Cir. 1994)). Thus, the Court may elect to exercise supplemental jurisdiction even "after the claim against the federal defendant is dismissed on exhaustion grounds," as here. *See id.* (citing *IMFC Pro. Servs. of Fl., Inc. v. Latin Am. Home Health, Inc.*, 676 F.2d 152, 156, 158–59 (5th Cir. 1982)); *see also McNeil v. Duncan*, No. 19-694, 2022 WL 2785970, at *5 (D.D.C. July 15, 2022) (holding that the court "'retains the power either to adjudicate the underlying state law claims or to remand the case to state court'" where "the dismissal of the United States on sovereign immunity grounds leaves the Court with state-law tort claims against [non-federal] Defendants" (quoting *D.C. v. Merit Sys. Prot. Bd.*, 762 F.2d 129, 132 (D.C. Cir. 1985)).

Under 28 U.S.C. § 1367(c)(3), "district courts may decline to exercise supplemental jurisdiction over a claim . . . [where] the district court has dismissed all claims over which it has original jurisdiction." Whether to exercise supplemental jurisdiction over a claim for which the court does not have original jurisdiction is within the court's discretion. *See Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 617–18 (4th Cir. 2001). In the exercise of this discretion, courts focus on "the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 350 n.7.

This is the "usual case." *Id.* The Court has dismissed the claims against the United States—the only claims over which it had original jurisdiction. Because the remaining claims sound in state law alone, a state court is better suited to hear them. Exercising supplemental jurisdiction would not promote judicial economy, comity, or fairness. The Court thus declines to exercise supplemental jurisdiction over the Sainis' remaining claims and remands them to the Circuit Court for Montgomery County.

## VI.    Conclusion

For the foregoing reasons, the Sainis have not met their burden to challenge Westfall Act certification. The United States is the proper defendant for their claims against LCDR Olsen. Because the Sainis have not exhausted administrative remedies under the FTCA, the United States is immune from suit. The claims against the United States are dismissed without prejudice for lack of subject matter jurisdiction. The motion for leave to file a supplemental reply memorandum in support of the motion for leave to file an amended complaint is denied as moot, without prejudice to renewal in state court. The Sainis' motion to schedule a case management conference is denied as moot. The case is remanded to the Circuit Court for Montgomery County for further proceedings.

A separate Order follows.


Date: February 20, 2026

_____
Deborah L. Boardman
United States District Judge

27